**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATRINA R. EVANS, | ) | CASE NO. 1:24-CV-713-DAR |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.     INTRODUCTION

The Commissioner of Social Security denied Plaintiff Katrina R. Evans's application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Ms. Evans seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated April 19, 2024).

For the reasons set forth below, I RECOMMEND that the Court VACATE the Commissioner's decision and REMAND this matter for further proceedings consistent with this opinion.

## II.     PROCEDURAL HISTORY

In December 2021, Ms. Evans applied to the Social Security Administration (SSA) seeking period of disability, DIB, and SSI benefits; she claimed that she became disabled on March 1,

2020. (Tr. 247–49, 353, 367.)[1] She identified ten allegedly disabling conditions: (1) headaches; (2) memory loss; (3) blurred vision; (4) post-traumatic stress disorder; (5) attention-deficit/hyperactivity disorder; (6) obesity; (7) panic; (8) anxiety; (9) pseudotumor; and (10) bipolar. (Tr. 406.)

The Social Security Administration ("SSA") denied Ms. Evans's application initially and upon reconsideration. (Tr. 250, 255, 262, 267.) Ms. Evans requested a hearing before an administrative law judge ("ALJ"). (Tr. 270.) The ALJ held a hearing on March 22, 2023, at which Ms. Evans was represented by counsel. (Tr. 164–200.) Ms. Evans testified, as did her mother and an independent vocational expert ("VE"). (*Id.*)

On April 10, 2023, the ALJ issued a written decision finding that Ms. Evans is not disabled. (Tr. 29).

Ms. Evans requested review of the ALJ's decision. (Tr. 350–51.) Her counsel submitted a letter brief to the SSA Appeals Council identifying alleged errors in that decision. (Tr. 479–80.) On February 21, 2024, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On April 19, 2024, Ms. Evans filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Evans asserts the following assignment of error:

> The ALJ's Step Three finding is not supported by substantial evidence because [Ms. Evans's] record raised a "substantial question" over whether her migraines medically equaled Listing 11.02.

(ECF No. 7, PageID# 1265.)

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 247"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 1265").

### III.    BACKGROUND[2]

#### A.    Personal, Educational, and Vocational Experience

Ms. Evans graduated high school. (Tr. 407.) She worked as a food service worker in a nursing home between 2012 and 2014. (Tr. 169.) She worked in a retail position for a little longer than six months in 2018, where she ran the register at a supermarket and assisted with stocking, inventory, ordering, and cleaning. (Tr. 170–71.) She has performed other various jobs that the ALJ found did not qualify as substantial gainful activity. (*E.g.*, Tr. 170, 172, 391–97, 407–08, 467–70.) She lives with her mother. (Tr. 176.)

#### B.    Function Reports

Ms. Evans completed a function report in March 2022. (Tr. 414–21.) She reported that, as a result of the pseudotumor, she "can't lift anything heavy and get[s] chronic migraines." (Tr. 414.) She complained that migraines and anxiety often keep her from falling asleep. (Tr. 415.) She described that lifting more than ten or fifteen pounds adds pressure in her head, as does squatting, bending, standing, reaching, walking, sitting, and kneeling. (Tr. 419.) She can walk for five to ten minutes before needing to rest for 20 to 30 minutes. (*Id.*)

She described memory loss, writing that she "can't remember things 5–10 minutes after they happen." (Tr. 414.) She said she often forgets to bathe or take her medicine. (Tr. Tr. 415–16.)

She complained of a loss of focus, in that she "can't concentrate for long periods of time." (Tr. 414.) She identified anxiety and depression that cause a "fog" and make it difficult for her to be around people for more than a few minutes. (*Id.*) Her ability to talk, complete tasks, concentrate, understand, follow instructions, and get along with others "all depend[] on [her] anxiety and

---

[2] Ms. Evans's assignment of error focuses on her alleged limitations stemming from migraine headaches. Therefore, I limit my discussion of the factual background to those facts relevant to Ms. Evans's headaches and related limitations.

depression that day." (Tr. 419.) She can pay attention for five to ten minutes at a time "if [she is] lucky" and does not follow written or spoken instructions well because she loses focus and forgets what she is told. (*Id.*) She wrote that she does not handle stress or changes in routine well and "fear[s] others, even people [she has] known her entire life." (Tr. 420.)

On a daily basis, Ms. Evans will have coffee and, sometimes, breakfast. (Tr. 415.) She will watch television or read, and then she sometimes eats lunch. (*Id.*) She will then watch more television, read, or listen to music, before eating dinner, showering, and going to bed. (*Id.*) She showers twice a week, which she attributes to her depression. (*Id.*) She is able to prepare easy meals like sandwiches, ramen noodles, and frozen pizza. (Tr. 416.) She daily puts away her laundry and makes her bed, but she needs reminders to do so. (*Id.*)

Ms. Evans no longer drives because she is scared of being alone and because the last time she drove, she "forgot [she] was driving and ran a red light." (Tr. 417.) She only leaves the house for doctors' appointments, addiction recovery meetings, and shopping. (*Id.*) She shops once a month for groceries. (*Id.*) She interacts daily with friends—she has three friends—through text messaging. (Tr. 417–18.)

When appealing the initial disability denial, Ms. Evans provided additional information through her counsel. (Tr. 429–35.) She reported that her conditions worsened in April 2022; among other things, she said her confusion, memory loss, and depression had worsened and her anxiety was "super high." (Tr. 430.) She further wrote that her headaches were "increasing in duration and intensity" such that they had become "all consuming." (Tr. 430, 433.)

Ms. Evans completed a second function report in June 2022. (Tr. 436–44.) In addition to reiterating some of the information from her first report, she explained that she cannot focus long enough to complete tasks and said that "[chronic] migraines with light sensitivity and sound

4

sensitivity make it hard to do any work." (Tr. 436.) She described that depression and chronic pain keep her in bed "more often than not." (Tr. 438.) She wrote that she is no longer able to make even simple meals for herself because she forgets what she is doing. (Tr. 439.) She estimated that she could now only pay attention for a minute or two at a time. (Tr. 442.)

When appealing the reconsideration-level denial of her claim, Ms. Evans provided additional information in September 2022. (Tr. 448–55.) She again complained that her memory issues were getting worse and said she cannot think or focus properly for more than a couple minutes at a time and "can't remember what [she has] done seconds after doing it." (Tr. 449.) She started a new medication for her migraine headaches and said her "psychiatrist is also getting ready to change my medication and/or put [her] on new medication as soon as he finishes his full diagnosis." (*Id.*) She wrote that she "can't function as a normal human being" and complained that her doctors were not taking her memory issues seriously. (Tr. 454.) She repeated that her symptoms had worsened since she contracted COVID-19 in March 2020. (*Id.*)

**C.**     **Relevant Hearing Testimony**

*1.*     ***Ms. Evans's Testimony***

Ms. Evans testified that "it hurts" to stand, walk, or sit. (Tr. 173.) She estimated that she can be on her feet only for a few minutes at a time, "[t]en at max, maybe, if I'm lucky." (Tr. 179.) She described that when she is on her feet, they start "hurting really bad," then her knee stiffens "to the point that [she] can't bend or straighten out [her] leg," then her hips stiffen, and it slowly progresses to "excruciating" pain "to where I am holding back tears." (Tr. 178.) Similarly, she can only sit for ten or fifteen minutes before she needs to move around or lie down. (Tr. 179.) She tends to sit cross-legged because she has found that her legs hurt less in that position. (*E.g.*, Tr. 181.)

It is Ms. Evans's understanding that she is medically limited to lifting ten pounds because of her pseudotumor; it is also her understanding that squatting or bending over puts additional pressure on her brain. (Tr. 180–81.)

Ms. Evans said she has migraine headaches "[m]ultiple days a week." (Tr. 177–78.) The headaches typically last for five or six hours at a time, during which she "usually just curl[s] up in bed, no light, no sound and hope it passes." (Tr. 177.) She has a "rescue medication" to use if a headache grows too intense; she uses the medication multiple times a week. (Tr. 177–78.)

She also said that she has anxiety and does not "deal well with people." (Tr. 173.) She has a hard time focusing and finds that she has memory problems. (*Id.*) She normally only leaves the house once a week to attend therapy appointments. (Tr. 174.) She finds therapy "relieving" in that she is being educated about her condition, but she said therapy was not helping her to be around other people. (Tr. 175.) She has a "couple" friends with whom she occasionally communicates over social media. (*Id.*)

Ms. Evans testified that she lives with her mother, who takes care of grocery shopping and other errands for Ms. Evans. (Tr. 176.) Ms. Evans testified that she no longer drives because her primary care physician told her not to drive in light of her focus and memory problems. (*Id.*)

### 2. *Theressa Evans's Testimony*

Theressa Evans—Ms. Evans's mother—testified that Ms. Evans has not driven in over a year; the last time Ms. Evans drove, she "forgot what she was doing and ran a red light." (Tr. 183.)

Theressa described that Ms. Evans does not help with any household chores and does not go to the grocery store or run errands. (Tr. 184.) When Ms. Evans has tried to help with dishes, she "fidgets," she "rock[s] back and forth," her knees and hips bother her, and she "drops everything," breaking dishes. (*Id.*) When Ms. Evans has tried to help with sweeping or mopping,

she "gets dizzy and lightheaded" and forgets what she is doing. (*Id.*)

Ms. Evans daily has migraine headaches; she is "always in her room with the blinds pulled and . . . she's always got a headache, always dizzy, queasy, almost lethargic." (Tr. 186.) She spends "23 hours a day" in her room, either sitting or lying down; Theressa has to remind her to shower, eat, and take her medicine. (Tr. 189–90.) Ms. Evans forgets whether she took her medicine, even 15 minutes after being reminded to take them. (Tr. 189.)

Theressa estimated that these issues arose around two years ago and have been getting worse. (Tr. 185.) Before Ms. Evans contracted COVID-19, "she was quick-witted, self-motivated, strong, smart, extremely independent[,]" and "loved to read and go for walks." (Tr. 187.) She has been a "completely different person" since contracting COVID-19 and the pseudotumor. (*Id.*)

Ms. Evans received carpal-tunnel surgery in both hands, but she continued complaining of pain in her hands and still drops things sporadically even after the surgery. (Tr. 188.)

### 3.  *Vocational Expert's Testimony*

The vocational expert (VE) classified Ms. Evans's past nursing-home position as a "foodservice worker, hospital" (DOT 319.677-014), which is classified as a medium-exertion position, but which was actually performed at the heavy exertional level. (Tr. 191.) The VE classified Ms. Evans's previous work in retail as a "cashier-checker, retail" (DOT 211.462-014), which is classified as a light exertion position, but which was actually performed at the heavy exertional level. (*Id.*)

In her first hypothetical question, the ALJ asked the VE to consider a hypothetical individual who could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently. (*Id.* at 191–92.) The person could also occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 192.)

Moreover, the person could understand, remember, and apply information to complete simple instructions in a routine work environment with hourly-piece-rate-type work; the person could interact with the general public, coworkers, and supervisors for work-related tasks and purposes such as asking questions, clarifying instructions, gathering information and data, helping, pointing, or directing where items may be placed. (Tr. 192.)

The ALJ asked the VE whether such a person could perform any of Ms. Evans's past work. (*Id.*) The VE testified that such a person could perform the foodservice-worker position as classified in the DOT (i.e., at the medium exertional level). (*Id.*)

In her second hypothetical question, the ALJ asked the VE to assume that the hypothetical person from the first hypothetical was further limited as follows: the person was limited to the light exertional level; could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; the person could never climb ladders, ropes, or scaffolds, but could frequently perform "all other postural activities"; the person could handle objects bilaterally; the person could never work in unprotected heights or operate dangerous moving equipment. (Tr. 192.)

The VE testified that such a person could not perform any of Ms. Evans's past work. (Tr. 193.) But the VE said that such a person could perform other work such as that of a "marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "mail clerk" (DOT 209.687-026). (Tr. 193.)

In her third hypothetical, the ALJ asked the VE to assume that the hypothetical person from the previous question would be off-task ten percent of the workday. (Tr. 193.) The VE testified that the additional limitation was work-preclusive because a person cannot maintain employment if they are chronically (three consecutive months or more) off-task for ten percent of the workday. (*Id.*)

For her fourth hypothetical, the ALJ asked the VE to assume that the hypothetical person from the second hypothetical question would miss work one day per month and, on two additional days, would leave early or come in late. (Tr. 193–94.) The VE testified that that level of chronic absenteeism would be work-preclusive. (Tr. 194.)

Ms. Evans's counsel then asked a hypothetical question: would the jobs the VE identified for person in the second hypothetical be available if the person could only occasionally handle, finger, and feel? (*Id.*) The VE testified that those jobs would not be available, but that there were a "limited number" of jobs at the light exertional level that such a person could perform, including that of an "usher" (DOT 344.677-044), "washroom attendant" (DOT 358.677-018), or "furniture rental clerk" (DOT 295.357-018). (Tr. 194–96.) The VE confirmed that these jobs would not be available if the person had an additional limitation that they could only occasionally interact with supervisors, coworkers, and the public. (Tr. 196.) Similarly, the jobs would not be available to the person from the second hypothetical if that person had an additional limitation in that they could have no interaction with the public and "not in a public setting where the public can enter in and out." (*Id.*)

Counsel next asked the VE to consider that the person from the second hypothetical could only occasionally interact with others. (Tr. 196.) The VE testified that such a person could perform the work of a "mail clerk" or "marker," but such a person could not perform the work of a "routing clerk." (Tr. 197–98.)

Counsel next asked the VE to consider that that person from the second hypothetical could occasionally interact with supervisors and coworkers but could have no interaction with the general public or "be in a public setting." (Tr. 198.) The VE testified that such a person could not perform the work of a "marker" but could perform the work of a "mail clerk." (*Id.*) Additionally, the person

9

could perform the work of a "cleaner, housekeeping" (DOT 323.687-014) or "photocopying machine operator" (DOT 207.685-014).

Counsel next asked if any jobs would be available to a person who could only be on their feet for two hours a day and who could only occasionally handle, finger, or feel. (Tr. 199.) The VE said that only one job would remain, that of a "surveillance system monitor" (DOT 379.367-010). (*Id.*) The VE confirmed that the job would remain available even if the person had the additional social interaction limitations as the person from the second hypothetical. (*Id.*) However, if the person was further limited in that they could not be responsible for the health, safety, or welfare of others, the job would not be available. (*Id.*)

## 1.  State Agency Consultants

### a.  *Initial Level*

A disability examiner (Patricia Bavis), a psychologist (Irma Johnston, Psy.D.), and a neurologist (Christina Orfei, M.D.) reviewed Ms. Evans's claim at the initial administrative level. (Tr. 201–19.)

Dr. Orfei opined that that magnetic-resonance imaging were consistent with the diagnosed pseudotumor cerebri but concluded that Ms. Evans's "[h]eadaches are controlled with [medication], with headaches occurring 1/week mild in intensity." (Tr. 205.) Dr. Orfei opined that Ms. Evans had several mild exertional and postural limitations but retained the ability to perform most functions, including frequently climbing stairs, balancing, stooping, kneeling, crouching, and crawling, and standing or sitting for six hours each with normal breaks. (*See* Tr. 204–05.)

In coming to this conclusion, Dr. Orfei found Dr. Samantha Kiefer's December 29, 2021, medical opinion to be "vague" and only partially consistent with the record, in that the opinion relied heavily on Ms. Evans's subjective report of symptoms, which were not supported by the

totality of the evidence. (Tr. 204.) Dr. Orfei concluded that Ms. Evans's medical examinations "are fairly normal and do not support the need to avoid driving." (*Id.*) She opined that "[s]ome subjective loss" in memory and recall was to be expected from Ms. Evans's conditions "but are not supported . . . to the extent reported . . . ." (*Id.*)

Dr. Johnston opined that Ms. Evans had a moderate limitation with respect to her ability to understand and remember detailed instructions. (Tr. 205–06.) Dr. Johnston further noted moderate limitations with Ms. Evans's ability to carry out detailed instructions, maintain attention and concentration for extended periods, and with respect to her ability to complete a normal workday and workweek without psychologically based interruptions. (Tr. 206.) But she concluded that Ms. Evans retained the ability to complete simple and moderately complex one- to four-step tasks with no fast-pace or strict production requirements. (Tr. 206.) Further, Dr. Johnston opined that Ms. Evans had the ability to perform work "with limited contact with the general public" but could not perform work that required mentoring, negotiating, instructing, supervising, diverting, or persuading. (*Id.*) Finally, Dr. Johnston opined that despite a moderate limitation with respect to the ability to respond to appropriate changes in the work setting, Ms. Evans retained the ability to do work "in a static setting with few changes in daily duties"; Ms. Evans would need advance notice and additional management support when workplace duties change. (Tr. 206–07.)

Based on these findings, the consultants found that Ms. Evans was limited to medium-exertion-level work but was not disabled. (Tr. 207–08.)

In a letter to Ms. Evans explaining the decision, the Agency wrote that "the records show you are able to walk, stand, and use your arms adequately to perform work related tasks that require less exertion" and "[a]lthough you may experience symptoms of impaired memory, depression and anxiety at times, the findings show you are able to think, communicate, and related adequately

to others to perform simple work related tasks." (Tr. 253, 258.)

### b. Reconsideration Level

At the reconsideration level, a disability examiner (David Carver), a physician (Steve McKee, M.D.), and a psychologist (Aracelis Rivera, Psy.D.) affirmed the finding that Ms. Evans is not disabled. (Tr. 220–41.) Drs. McKee and Rivera further opined that the updated evidence was consistent with the initial RFC. (Tr. 225, 227, 229.) The consultants at the reconsideration level found that Ms. Evans was limited to unskilled work, a change from the initial level, but they concluded that she had the residual functional capacity to perform the work of an "automatic car wash attendant" (DOT 915.667-010), "folder, laundry" (DOT 369.687-018), or "photocopying machine operator" (DOT 207.685-018). (Tr. 229–30.)

In a letter to Ms. Evans explaining the decision, the Agency wrote that Ms. Evans is "still able to move about and function fairly well" and "do[es] experience significant pain but . . . [is] still able to perform lighter types of work activities." (Tr. 265.) The Agency further wrote that Ms. Evans's "mental health is fairly stable" and that she demonstrated "adequate concentration and memory to complete various types of work tasks." (*Id.*)

### D.    Relevant Medical Evidence

Ms. Evans consulted with Dr. Samantha Kiefer, her primary care doctor, on August 30, 2019. (Tr. 893.) Ms. Evans complained of "dental migraines." (Tr. 893.) Dr. Kiefer assessed these as temporomandibular-joint migraines. (*Id.*) Dr. Kiefer kept her on "conservative management," using acetaminophen/aspirin/caffeine (Excedrin) as needed. (*Id.*)

Ms. Evans consulted with Dr. Preetha Muthusamy, M.D., on November 4, 2020. (Tr. 526.) She reported that she has felt pain/pressure in her head for two years, at an intensity she rated at a four out of ten. (Tr. 527.) At an appointment with Dr. Kiefer that month, the doctor noted that Ms.

Evans "does suffer from chronic migraines." (Tr. 883.)

Ms. Evans underwent an MRI, which showed a "constellation of findings suggestive of intracranial hypertension." (Tr. 501.)

At a follow-up appointment with Dr. Muthusamy on January 6, 2021, Ms. Evans reported that her headache was "constant"; she denied visual auras but reported nausea, photophobia, and phonophobia. (Tr. 517, 773.) The doctor diagnosed Ms. Evans with pseudotumor cerebri and started her on a diuretic medication. (Tr. 520.) He also adjusted her prescription for topiramate, a medication that can be used to prevent migraine headaches, because Ms. Evans reported that it was causing confusion. (*Id.*)

Ms. Evans reported her migraines and "spinal fluid around her brain" at a telehealth counseling appointment on March 2, 2021. (Tr. 625.) Her speech was assessed as clear, and her thought processes were logical. (*Id.*)

Ms. Evans continued with medication management and counseling through 2023. Treatment notes from these sessions reflect reported problems with isolation, low energy and motivation, anxiety, depression, trouble focusing and concentrating, and other mental-health challenges. Ms. Evans reported a number of stressors and factors that she felt were contributing to these conditions over the years, including, among others: conflict with her mother and other relatives, anxiety around dating, the death of a friend, and fear of COVID-19 and falling ill. She reported a number of positive improvements, including getting and training a puppy, going out with friends, dating, attending a Renaissance Festival, attending a holiday party, making costumes and decorative props, and going on vacation.

While I do not summarize these notes individually here because they are not relevant to my ultimate conclusions in this matter, I note that I have reviewed them and they do not reflect

that Ms. Evans meaningfully complained about migraine headaches or discussed her headaches as a factor with respect to her mental health challenges, unless otherwise indicated; moreover, Ms. Evans is routinely assessed as having normal speech, thought processes, insight, and judgment. (*See* Tr. 538, 541, 544, 547, 550, 553, 556, 559, 562, 565, 568, 571, 574, 577, 580, 583, 586, 589, 592, 595, 598, 601, 604, 607, 610, 613, 616, 618, 648, 651, 654, 657, 660, 663, 666, 669, 672, 675, 678, 681, 684, 687, 690, 693, 696, 699, 705, 708–09, 711–12, 715, 718, 721, 723–24, 727, 730, 732–33, 735–36, 748, 751, 754 (but reported "some physical health changes"), 837, 840, 842, 909, 911–12, 915, 918, 921, 1004, 1007, 1032–33, 1039, 1064–65, 1067, 1069 ("health issues the same"), 1072, 1075, 1078, 1081, 1084, 1115, 1119, 1122, 1125, 1128, 1205, 1208–09, 1211–12, 1214–15, 1217.)

At a medication management appointment on March 12, 2021, Ms. Evans reported trouble concentrating and said she was forgetting things easily since being on topiramate; this fact continued to be reported in treatment notes going forward. (Tr. 618.)

Ms. Evans consulted with Dr. Muthusamy on April 6, 2021. (Tr. 520.) She reported that her headaches were "[m]uch fewer" but with an intensity of six or seven out of ten. (Tr. 522.) She again reported nausea, photophobia, and phonophobia. (*Id.*) She was continued on the same medication because she was assessed as being "much better." (Tr. 524.)

On December 29, 2021, Dr. Samantha Kiefer, D.O., wrote a letter stating that Ms. Evans was her patient and was evaluated on December 29, 2021. (Tr. 633.) Dr. Kiefer wrote that Ms. Evans was "experiencing multiple medical conditions that make it unsafe to drive for now and very difficult to work." (*Id.*) The doctor noted that "[w]e are working on these medical conditions and we are hoping that these conditions are not permanent . . . ." (*Id.*) She stated her opinion that the conditions were disabling and that Ms. Evans should be "allowed benefits." (*Id.*)

14

At a counseling appointment on January 6, 2022, Ms. Evans reported that she "has been sick over the last couple of weeks and feels as through she's been sick ever since she had caught COVID." (Tr. 702.) She complained of allergies. (*Id.*)

On February 21, 2022, Ms. Evans consulted with Dr. Muthusamy. (Tr. 636.) She reported that she had run out of her headache medicine three weeks prior to the appointment. (Tr. 637.) She said she had had a headache for the previous two weeks and for fifteen to twenty out of the previous thirty days. (*Id.*) She also reported, though, that previously (*i.e.*, with medication) she was having milder headaches only once a week. (*Id.*) The headaches presented in the "middle of vertex" and Ms. Evans again said they were accompanied by nausea, photophobia, and phonophobia. (Tr. 647–38.) Dr. Muthusamy continued her on the headache medicine and also started her on thyroid medication because she had been diagnosed with hypothyroidism. (Tr. 638, 641.)

At an appointment with Dr. Kiefer on July 7, 2022, it was noted that Ms. Evans remained on topiramate and a diuretic for her pseudotumor, with sumatriptan "for breakthrough." (Tr. 1017.)

At an appointment with Dr. Muthusamy on August 22, 2022, it was noted that Ms. Evans complained of severe headaches three times per week, again in the "middle of vertex" with an intensity of six or seven out of ten. (Tr. 1057.) Ms. Evans again reported nausea, photophobia, and phonophobia. (*Id.*) Dr. Muthusamy noted that the migraines were "controlled" with medication. (Tr. 1060.)

At an appointment with Dr. Kiefer on November 3, 2022, the doctor noted that a new migraine medication—erenumab (Aimovig)—"is helping" with migraines. (Tr. 1139.)

Ms. Evans denied headaches at an emergency-room visit on November 7, 2022. (Tr. 1143.)

Ms. Evans consulted with Dr. Muthusamy on November 18, 2022. (Tr. 1170.) Ms. Evans reported one to two headaches every two weeks that were "[n]ot intense" but which were

accompanied by nausea, photophobia, and phonophobia. (Tr. 1172.)

Dr. Ronald Yendrek, D.O., completed an "Off-Task/Absenteeism Questionnaire" on January 11, 2023. (Tr. 1131.) Dr. Yendrek opined that Ms. Evans would be off-task at least 20 percent of the time based on "self reports [of] trouble with focus" and a diagnosis of ADHD. (*Id.*) The doctor also noted that Ms. Evans "sleeps 16–18 hours a day." (*Id.*) Dr. Yendrek opined that he expected Ms. Evans to miss about one work day per month. (*Id.*) He proceeded to opine on a number of moderate limitations that he has seen in Ms. Evans. (Tr. 1132–33.)

At an appointment with Dr. Kiefer on March 2, 2023, the doctor noted that a new migraine medication—erenumab (Aimovig)—"is helping" with migraines. (Tr. 1222.)

## IV. THE ALJ'S DECISION

The ALJ determined that Ms. Evans had not engaged in substantial gainful activity since March 1, 2020, the alleged disability-onset date. (Tr. 13).

The ALJ next determined that Ms. Evans had the following severe impairments: pseudotumor cerebri; migraine headaches; morbid obesity; bilateral carpal tunnel syndrome status post carpal tunnel releases; lumbosacral facet arthropathy; major depressive disorder; bipolar disorder; anxiety; and attention-deficit/hyperactivity disorder (ADHD). (Tr. 13–14.)

The ALJ also noted that Ms. Evans had the following non-severe impairments: hypothyroidism, controlled with medication; prediabetes; hepatomegaly with diffuse hepatic steatosis; "mild" medial compartment degenerative changes of the left knee; and articular injury of the left knee. (Tr. 14.) While the ALJ found these conditions to be non-severe, the ALJ noted that she considered all these conditions when determining Ms. Evans's residual functional capacity. (*Id.*)

The ALJ determined that neither COVID-19 nor long COVID were medically determinable

impairments. (*Id.*)

The ALJ determined that none of Ms. Evans's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ further determined that Ms. Evans had the residual functional capacity ("RFC") to:

> perform light work . . . except[:] she can lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; frequently handle bilaterally; no work in unprotected heights or operating dangerous moving equipment such as power saws and jack hammers; can understand, remember, and apply information to complete simple instructions in a routine work environment with no hourly piece rate type work; can interact with the general public, coworkers, and supervisors for work related tasks and purposes such as asking questions, clarifying instructions, gathering information/data, helping, and pointing or directing where items may be placed.

(Tr. 16.)

The ALJ found that Ms. Evans was 27 years old on the alleged disability onset date and had at least a high school education. (Tr. 27.) But the ALJ determined that Ms. Evans was unable to perform her past relevant work as a hospital food-service worker or as a retail cashier/checker. (*Id.*)

However, the ALJ determined that—considering Ms. Evans's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that Ms. Evans could perform, including work as a "marker" (DOT 209.587-034), "routing clerk" (DOT 222.687-022), or "mail clerk" (DOT 209.687-026). (Tr. 28.) Accordingly, the ALJ determined that Ms. Evans is not disabled. (Tr. 28–29.)

## V.  LAW & ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.     Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a

19

claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

## C.    **Analysis**

Ms. Evans contends that the ALJ erred at Step Three, when the ALJ found that none of Ms. Evans's conditions met or medically equaled a listing in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14.) Specifically, Ms. Evans contends that the record evidence raised a "substantial question"

as to whether her migraine headaches medically equaled Listing 11.02, Part B or D.

"The Listing of Impairments . . . describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Reynolds v Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(a)). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing'" and "[a] claimant must satisfy all of the criteria to 'meet' the listing." *Id.* (quoting 20 C.F.R. § 404.1524(c)(3)). "[T]he claimant must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).

Social Security Ruling ("SSR") 19-4p provides specific guidance on how "primary headache disorders" like migraines are established and evaluated. *See* SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). Specifically, SSR 19-4p explains that there is no Step Three listing for primary headache disorders, but these impairments may be found to be medically equivalent to Listing 11.02B. SSR 19-4p, 2019 WL 4169635, at *7. SSR 19-4p instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for a medically determinable impairment of a primary headache disorder. *Id.* In developing SSR 19-4p, the Social Security Administration referred to the third edition of the International Classification of Headache Disorders ("ICHD-3"), which provides classification of headache disorders and diagnostic criteria for scientific, educational, and clinical use. *Id.* at *2. The ICHD-3 diagnostic criteria for migraine without aura include pain lasting 4 to 72 hours (untreated or unsuccessfully treated) and at least two of four characteristics, those being: unilateral location, pulsating quality, moderate or severe pain intensity, or aggravation by or causing avoidance of routine physical activity. *Id.* at *5. Additionally, during the headache, the individual must

experience at least one of the following: nausea, vomiting, photophobia, or phonophobia. *Id.*

Regarding Listing 11.02, SSR 19-4p explains, in relevant part:

> While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her [medically determinable impairment](s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* at *7.

Here, the ALJ determined at Step Two that Ms. Evans suffered from a severe medically determinable condition of migraines. (Tr. 13–14.) Yet, the ALJ determined at Step Three that Ms. Evans did not meet or medically equal Listing 11.02, reasoning briefly that "there is no evidence of headaches occurring at the required frequency, despite adherence to prescribed treatment." (Tr. 14.)

The ALJ later pointed to evidence documenting that Ms. Evans's headaches were "much better" in April 2021 on treatment (*see* Tr. 19), were noted to be "controlled" with medication in February and August 2022 (*see* Tr. 20–21), and "stable" in November 2022 (*see* Tr. 21). The ALJ further found that Ms. Evans was "more active and capable than alleged," pointing to evidence

that, at various times between 2021 and 2023, Ms. Evans went out with friends, dated, attended a Renaissance Festival, went to a family gathering and a holiday party, attended a funeral, took a vacation to Virginia, attended routine addiction recovery meetings, and went Black Friday shopping. (*See* Tr. 25.)

The Commissioner defends the ALJ's conclusion, arguing that (1) Ms. Evans did not meet her burden to show that her migraine headaches were so severe as to medically equal the listing; (2) Ms. Evans's reports regarding the frequency of her headaches were inconsistent, "ranging from multiple headaches a day to only one . . . or two every few weeks"; and (3) in any event, agency policy would have prevented the ALJ from finding medical equivalence in the absence of a prior administrative finding from an agency doctor, evidence from a medical expert at the hearing level, or a report from Appeals Council medical-support staff, *see* SSR 17-2p, 2017 WL 3928306, at *4 (S.S.A. Mar. 27, 2017).

After careful consideration, I agree with Ms. Evans that the ALJ's conclusion that there was *no evidence* that her headaches occurred frequently enough to meet the listing is inaccurate. (Tr. 14.) In making such a definite statement, the ALJ left the impression that she ignored contradictory evidence that Ms. Evans continued to have frequent headaches despite treatment. Even the Commissioner acknowledges that the medical evidence on Ms. Evans's headaches is "mixed." (*See* Def. Merits Br. at 9, ECF No. 9, PageID# 1279.)

For example, medical records document that Ms. Evans reported headaches 15 to 20 out of the previous 30 days in February 2022 (Tr. 637) (although Ms. Evans had run out of her medication before this appointment, she reported that she was still having headaches once a week while on the medication); three times per week in August 2022, despite being on medication (Tr. 1057); and one or two headaches every two weeks in November 2022, despite medication (Tr. 1172).

Moreover, some of the symptoms mentioned in the treatment notes align with the stated ICHD-3 criteria for migraine without aura, *i.e.*, pain lasting 4 to 72 hours (untreated or unsuccessfully treated); at least two of four characteristics (unilateral location, pulsating quality, moderate or severe pain intensity, or aggravation by or causing avoidance of routine physical activity); and the experience of either nausea, vomiting, photophobia, or phonophobia during one's headache. SSR 19-4p, 2019 WL 4169635, at *5.

For example, Ms. Evans reported nausea, photophobia, and phonophobia in February and August 2022 (Tr. 637, 638, 1057) and her pain was reported as a six or seven out of ten in February 2022 (Tr. 637). Her pain was consistently reported in the "middle of vertex." (Tr. 637, 1057, 1172.)

It is true that the medical notes suggest that Ms. Evans's symptoms were improving with treatment—she described her headaches as "not intense" in November 2022 (Tr. 1172). It is also true that the records reflect a degree of continued activity that could be considered inconsistent with the reported severity of Ms. Evans's headaches. And Ms. Evans's counseling notes suggest potential alternative reasons for Ms. Evans's reported isolation, including fears of COVID and other anxieties. I express no opinion as to the credibility of Ms. Evans's reported symptoms or on the question of whether the record evidence actually medically equals the severity criteria of the listing, matters that I am convinced the ALJ should consider and articulate reasoning for in the first instance.

But where the ALJ explicitly addressed the frequency criterion of Listing 11.02, and where there is no evidence that the ALJ fully considered all the evidence pertaining to the frequency of Ms. Evans's migraine headaches—the sole articulated reason for finding that she did not medically equal the listing—I am convinced that this matter should be returned to the Agency for the ALJ to fully consider and articulate in the first instance whether Ms. Evans medically equals the listing.

*See Scott v. Comm'r of Soc. Sec.*, Case No. 1:23-CV-01765-BMB, 2024 WL 3678788, *16 (N.D. Ohio July 15, 2014), *report and recommendation adopted*, 2024 WL 3675802; *Dillard v. Comm'r of Soc. Sec.*, No. 3:23-cv-00619-JJH, 2024 WL 3205927, at *13 (N.D. Ohio Feb. 15, 2024), *report and recommendation adopted*, 2024 WL 3201110 (N.D. Ohio June 27, 2024) (remanding where the ALJ did not fully consider the SSR 19-4p criteria, and stating that "the ALJ's focus should have been on records from the treating providers memorializing [the applicant's] statements regarding her migraine headaches, including . . . frequency . . . ."); *see also Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *10 (W.D. Ky. Feb. 9, 2021).

The Commissioner's first and third arguments—which are essentially that any error in the ALJ's opinion are harmless based on the other listing criteria relevant to severity and based on other Agency policy—are not well-taken because the ALJ's articulated reasoning with respect to Listing 11.02 rests solely on her finding there was *no evidence* that Ms. Evans met the frequency criterion, an incomplete summary of the evidence. (*See* Tr. 14.)

All this is to say that, viewing the evidence as a whole, the ALJ's conclusion does not appear to be supported by substantial evidence at this time because it is unclear from the decision how the ALJ reached the conclusion that Ms. Evans's migraine headaches did not rise to the documented frequency required by the listing.

Accordingly, Ms. Evans's assignment of error has merit.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE the Commissioner's final decision and REMAND this matter for further proceedings consistent with this opinion.

Dated: December 23, 2024                    */s Jennifer Dowdell Armstrong*
                                                      Jennifer Dowdell Armstrong
                                                      U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same

argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).